UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| PRECISION RX COMPOUNDING, LLC, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Case No. 4:16-CV-0069 (CEJ) |
| EXPRESS SCRIPTS HOLDING COMPANY, et al., | ) ) ) | |
| Defendants. | ) ) | |

## <u>MEMORANDUM AND ORDER</u>

This matter is before the Court on the motion of defendants Express Scripts Holding Company and Express Scripts, Inc. (collectively, "Express Scripts") to dismiss plaintiffs' first amended complaint. Plaintiffs have responded in opposition, and the issues are fully briefed.

## I.    <u>Background</u>

Plaintiffs are six individual compounding pharmacies. Express Scripts is a pharmacy benefit manager (PBM) that contracts with health plan administrators and insurance payors to manage pharmacy benefit plans and to facilitate the delivery of prescription drugs to health plan members and other beneficiaries. The complaint alleges a conspiracy between the nation's four largest PBMs—Express Scripts, CVS Health Corporation, OptumRx, Inc., and Prime Therapeutics, LLC—to jointly boycott compounding pharmacies and eliminate plaintiffs from the market by ending insurance coverage for compounded prescription medications in violation of the Sherman Act, 15 U.S.C. § 1, and state antitrust laws in Florida, Texas and Virginia. Plaintiffs also assert that Express Scripts' conduct constitutes unfair

competition and tortious interference with business relations under Florida, Missouri, Texas and Virginia common law.

To eliminate competition from compounding pharmacies, plaintiffs allege that Express Scripts and its co-conspirators agreed to: (1) engage in a campaign of misleading statements impugning the safety and efficacy of compounded drugs through communications to patients or doctors; (2) drastically reduce the revenues compounding pharmacies would be reimbursed for prescribed compounded drugs by eliminating any coverage or denying claims for compounded medications, even when no changes were made to underlying health plans; (3) orchestrate onerous procedural and administrative obstacles for the compounding pharmacies to fill prescriptions and obtain reimbursement; (4) conduct abusive audits of compounding pharmacies on claims the PBMs had approved many months earlier and then withhold reimbursement payable to compounding pharmacies on unrelated claims; (5) restrict or eliminate the use of mail-order delivery of compounded drugs; and (6) completely remove pharmacies from the networks by terminating the provider agreements without cause or on a pretextual basis. Plaintiffs claim that Express Scripts and its co-conspirators agreed to boycott individual compounding pharmacies so they could shift the fulfillment of compounded prescriptions to pharmacies in which they have an economic interest. Defendants move to dismiss the complaint, contending that plaintiffs have not pled sufficient allegations to support their claims.

## II. __Legal Standard__

The purpose of a motion to dismiss under Rule 12(b)(6) is to test the legal sufficiency of the complaint. Fed. R. Civ. P. 12(b)(6). The factual allegations of a

complaint are assumed true and construed in favor of the plaintiff, "even if it strikes a savvy judge that actual proof of those facts is improbable." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 556 (2007) (citing Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508 n.1 (2002)); Neitzke v. Williams, 490 U.S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations."); Scheuer v. Rhodes, 416 U.S. 232, 236 (1974) (stating that a well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely"). The issue is not whether the plaintiff will ultimately prevail, but whether the plaintiff is entitled to present evidence in support of his claim. Scheuer, 416 U.S. at 236. A viable complaint must include "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570; see id. at 563 (stating that the "no set of facts" language in Conley v. Gibson, 355 U.S. 41, 45–46 (1957), "has earned its retirement"); see also Ashcroft v. Iqbal, 556 U.S. 662, 678–84 (2009) (holding that the pleading standard set forth in Twombly applies to all civil actions). "Factual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555.

### III.  Discussion

#### A.  Antitrust Claims

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1.[1] To maintain a successful § 1 action, plaintiffs must show "(1) that there was a contract, combination, or conspiracy, *i.e.*, an

---

[1] The analog provisions in the Florida, Texas and Virginia antitrust statutes specify that they should be construed in accordance with federal precedent interpreting federal antitrust laws. See Fla. Stat. Ann. § 542.32; Tex. Bus. & Com. Code Ann. § 15.04; Va. Code Ann. § 59.1-9.17. Therefore, the Court will evaluate plaintiffs' claims under federal and state antitrust laws together (Counts I–IV).

agreement or concerted action toward 'a common goal,' (2) that the agreement 'unreasonably' restrains trade . . . and (3) that the restraint affected interstate commerce." T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 632–33 (9th Cir. 1987) (internal citations omitted) (summarizing Supreme Court doctrine). The first element of a § 1 case requires that defendants "had a conscious commitment to a common scheme designed to achieve an unlawful objective." Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 768 (1984). The second element, unreasonable restraint of trade, can be established under either a *per se* rule of illegality or a rule of reason analysis. E.g., FTC v. Ind. Fed'n of Dentists, 476 U.S. 447, 457–58 (1986). If a court determines that the challenged behavior falls within the discrete category of conduct that is illegal *per se*, a plaintiff need not prove its anticompetitive effects. Flegel v. Christian Hosp., Ne.-Nw., 4 F.3d 682, 686 (8th Cir. 1993).

Defendants argue that plaintiffs have failed to adequately allege that Express Scripts agreed with other PBMs to boycott plaintiffs or other compounding pharmacies. Defendants contend that the alleged parallel conduct of other PBMs following Express Scripts' announcement of its compound management solution is insufficient to support plaintiffs' conspiracy claims. Defendants also claim that the PBMs' common perceptions of the market provide an obvious, non-collusive alternative explanation for their alleged parallel behavior—that the goal and effect of their conduct was to reduce the costs of compounded pharmaceuticals that their third-party payor clients would be forced to bear.

To state a conspiracy claim under § 1 of the Sherman Act, plaintiffs must allege concerted, as opposed to unilateral, action. Willman v. Heartland Hosp. E.,

34 F.3d 605, 610 (8th Cir. 1994).  "Proof of concerted action requires evidence of a relationship between two or more legally distinct persons or entities."  Id. (citing Copperweld Corp. v. Indep. Tube Corp., 467 U.S. 752, 769 (1984)).  "[T]he antitrust plaintiff should present direct or circumstantial evidence that reasonably tends to prove that the [defendant] and others had a conscious commitment to a common scheme designed to achieve an unlawful objective."  Monsanto, 465 U.S. at 764 (quotations and citation omitted).   "[I]t is axiomatic that the typical conspiracy is 'rarely evidence by explicit agreements,' but must almost always be proved by 'inferences that may be drawn from the behavior of the alleged conspirators.'"  ES Dev., Inc. v. RWM Enters., Inc., 939 F.2d 547, 553–54 (8th Cir. 1991) (quoting H.L. Moore Drug Exch. v. Eli Lilly & Co., 662 F.2d 935, 941 (2d Cir. 1981)).

Allegations of parallel conduct and a conclusory assertion of a conspiracy alone will not suffice to state a plausible conspiracy claim under § 1 of the Sherman Act.  Twombly, 550 U.S. at 556.  However, "[i]t is possible to infer the existence of an agreement from consciously parallel conduct if the parallelism is accompanied by substantial additional evidence—often referred to as the 'plus factors.'"  Minn. Ass'n of Nurse Anesthetists v. Unity Hosp., 5 F. Supp. 2d 694, 704 (D. Minn. 1998) (quoting In re Potash Antitrust Litig., 954 F. Supp. 1334, 1350 (D. Minn. 1997)); see Twombly, 550 U.S. at 556–57 ("[W]hen allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.").   Illustrative plus factors courts have identified include:  "(1) a common motive to conspire, (2) evidence that shows that the

parallel acts were against the apparent individual economic self-interests of the alleged conspirators, and (3) evidence of a high level of interfirm communications." Mayor & City Council of Balt. v. Citigroup, Inc., 709 F.3d 129, 136 (2d Cir. 2013); see also In re Musical Instruments & Equip. Antitrust Litig., 798 F.3d 1186, 1194 (9th Cir. 2015) ("[P]lus factors are economic actions and outcomes that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action.").

Here, the complaint alleges plus factors in combination with parallel conduct to support an inference that defendants agreed with other PBMs to jointly boycott plaintiffs. As to parallel conduct, the complaint describes a combination of techniques defendants and their co-conspirators allegedly all used for the unified purpose of eliminating plaintiffs and other independent compounding pharmacies from the market. See SD3, LLC v. Black & Decker (U.S.) Inc., 801 F.3d 412, 427 (4th Cir. 2015) ("A plaintiff establishes parallel conduct when it pleads facts indicating that the defendants acted 'similarly.'" (quoting Petruzzi's IGA Supermarkets, Inc. v. Darling-Del. Co., Inc., 998 F.2d 1224, 1243 (3d Cir. 1993))); Hyland v. HomeServices of Am., Inc., 771 F.3d 310, 320 (6th Cir. 2014) (considering whether the defendants' actions were "uniform"). Specifically, plaintiffs allege that, beginning in the summer of 2014, each of the co-conspirators drastically increased the rejection rates for claims submitted for compounded medicines, sent misleading letters to patients and doctors regarding the lack of FDA approval for compounded medicines, created significant, meritless obstacles for compounding pharmacies to receive reimbursements, conducted abusive audits, prohibited independent compounding pharmacies from using mail delivery services

to provide medications to patients, and unilaterally terminated provider agreements with independent compounding pharmacies without cause or on the basis of pretext. See Compl. at ¶¶ 60–61, 91–131.

In combination with their alleged parallel conduct and other circumstantial elements, defendants' and their co-conspirators' joint involvement in a trade association supports an inference of a conspiracy. The complaint alleges that defendants and their co-conspirators are all members of and serve on the board of directors of the Pharmaceutical Care Management Association ("PCMA"). The PCMA "bring[s] together PBM industry leaders" to "shape the industry's direction and positions on a broad range of public policy issues." Compl. at ¶ 65. The PCMA provides "networking opportunities" and "private meeting time" to members, including specific meetings senior executives of Express Scripts and its co-conspirators attended in March 2013, October 2013, and April 2014. Compl. at ¶¶ 65, 67. Plaintiffs allege that Express Scripts and its co-conspirators used their common membership and control of the PCMA to meet, agree upon, and develop the horizontal boycott of independent compounding pharmacies. See Compl. at ¶¶ 62–67.

"Membership and participation in a trade group facilitates collusion" and provides opportunities to conspire. HM Compounding Servs., Inc. v. Express Scripts, Inc., No. 4:14-CV-1858 (JAR), 2015 WL 4162762, at *5 (E.D. Mo. July 9, 2015); see Evergreen Partnering Grp. v. Pactiv Corp., 720 F.3d 33, 49 (1st Cir.2013) (stating that exchanges between defendants through their common membership in a business group "may serve as practices facilitating collusion as they provide a basis for notifying alleged members of the conspiracy of the agreed-

upon refusal to deal as well as to keep tabs on members"); <u>In re Text Messaging Antitrust Litig.</u>, 630 F.3d 622, 628 (7th Cir.2010) (stating that the allegation that defendants belong to a trade association and exchanged price information directly at association meetings identified a practice that facilitates price fixing that would be difficult for authorities to detect).  The alleged parallel conduct directly followed the three PCMA meetings, providing a correlation to support an inference of a plausible relationship between the PBMs' meetings and their concerted actions.  <u>See HM Compounding Servs.</u>, 2015 WL 4162752, at *6 ("The timing of, and similarity between, [Express Scripts] and the co-conspirators' actions following their PCMA meeting in 2013, provides a plausible relationship between the PCMA meeting and these actions.").

Also, the highly concentrated nature of the PBM industry supports an inference of conspiracy.  <u>HM Compounding Servs.</u>, 2015 WL 4162762, at *5; <u>see</u> Compl. at ¶¶ 136–45.  PBMs manage 95% of all the drugs prescribed and covered under group and individual health plans.  Compl. at ¶ 137.  Express Scripts and its co-conspirators control approximately 80% of the PBM market.  <u>Id.</u>  Express Scripts alone controls 50% of the market.  Compl. at ¶ 21.  This degree of concentration supports a plausible inference of conspiracy.  <u>See</u> <u>Evergreen Partnering Grp.</u>, 720 F.3d at 48 (finding the complaint adequately alleged circumstantial evidence to establish a context for a plausible agreement for a claim of a Section 1 violation with allegations that five defendants controlled 90 percent of the market and participation of at least one defendant was necessary for plaintiff to enter the market); <u>In re Text Messaging</u>, 630 F.3d at 628 ("[T]he complaint in this case alleges that the four defendants sell 90 percent of U.S. text messaging services,

and it would not be difficult for such a small group to agree on prices and to be able to detect 'cheating' . . . ."); see also Todd v. Exxon Corp., 275 F.3d 191, 208 (2d Cir.2001) ("Generally speaking, the possibility of anticompetitive collusive practices is most realistic in concentrated industries.").

Next, plaintiffs allege that Express Scripts' "signaling" to co-conspirators demonstrates a plausible conspiracy. The complaint alleges that the PBMs engaged in parallel conduct following Express Scripts' June 2014 publication of their compound management solution, discussing a plan to eliminate 95% of revenues paid to plaintiffs and other compounding pharmacies. See Compl. at ¶¶ 69–75. PBMs generally compete with each other in providing pharmacy benefit management services to their third-party payor clients. Given the competitive market, plaintiffs claim that the defendants' public disclosure of the details of its business plan to achieve savings for its clients, including the timeframe and methods by which the plan would be accomplished, runs counter to Express Scripts' self-interest in competing against other PBMs for clients. Plaintiffs allege that defendants publically broadcast this plan to communicate to its co-conspirators that it was "affirming and activating the illegal agreement they reached in 2013 and 2014 and that those co-conspirators should do the same." Compl. at ¶ 74. The broadcasting of sensitive business information, plans or strategies is further circumstantial evidence of a conspiracy among competitors. See In re Pool Prods. Distrib. Market Antitrust Litig., 988 F. Supp. 2d 696, 711 (E.D. La. Dec. 18, 2013) (stating that courts and commentators have identified "actions that would be against the defendants' self-interest if the defendants were acting independently, but consistent with their self-interest if they were acting in concert" and "signaling"

as plus factors); <u>Merkle v. Aetna Health, Inc.</u>, No. 04-61713-CIV, 2005 WL 6151455, at *5 n.7 (S.D. Fla. Apr. 27, 2005) ("Examples of 'plus' factors include: (1) signaling of intentions . . . (4) actions taken contrary to economic self-interest . . . ." (internal quotations omitted)).

After Express Scripts' announcement of its compound management solution, the complaint alleges that each of the co-conspirators used similar tactics described above to implement the conspiracy's goal of eliminating plaintiffs and other independent compounding pharmacies from the market. <u>See</u> Compl. at ¶¶ 92–131. "These policy changes, made at or around the same time by multiple competitors, are also indicative of conspiracy." <u>HM Compounding Servs.</u>, 2015 WL 4162762, at *6. <u>See In re Text Messaging</u>, 630 F.3d at 628 ("[C]omplex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason would support a plausible inference of conspiracy.").

Defendants' contentions in support of their motion to dismiss the antitrust claims ask the Court to draw inferences in their favor instead of in plaintiffs' favor. <u>E.g.</u>, <u>St. Joseph's Hosp., Inc. v. Hosp. Corp. of Am.</u>, 795 F.2d 948, 954 (11th Cir. 1986) ("In ruling on the motion to dismiss, the district court must accept the well pleaded facts as true and resolve them in the light most favorable to the plaintiff."). In <u>Twombly</u>, the Supreme Court found that the complaint did not state a plausible claim for relief under § 1 of the Sherman Act, relying on the fact that the complaint pointed to an "obvious alternative explanation" for the defendants' conduct. <u>Twombly</u>, 550 U.S. at 567–68 ("[A] natural explanation for the noncompetition alleged is that the former Government-sanctioned monopolists were sitting tight,

expecting their neighbors to do the same thing."). The Court concluded that the alleged parallel conduct "was not only compatible with, but indeed was more likely explained by, lawful, unchoreographed free-market behavior." Iqbal, 556 U.S. at 680. Here, based on the factual allegations in the complaint and reasonable inferences drawn therefrom, unlike in Twombly and Iqbal, the Court is unable to conclude that the alternative explanation defendants propose for their behavior is "obvious" or "more likely" than plaintiffs' plausible claims. Cf. Hosp. Bldg. Co. v. Trustees of Rex Hosp., 425 U.S. 738, 746 (1976) (observing that "in antitrust cases, where 'the proof is largely in the hands of the alleged conspirators,' Poller v. Columbia Broad., 368 U.S. 464, 473 (1962), dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly").

To state a § 1 conspiracy claim under the Sherman Act and survive a Rule 12(b)(6) motion to dismiss, a plaintiff "need not show that its allegations suggesting an agreement are more likely than not true or that they rule out the possibility of independent action, as would be required at later litigation stages such as a defense motion for summary judgment, or a trial." Anderson News, LLC v. Am. Media, Inc., 680 F.3d 162, 184 (2d Cir. 2012) (internal citations omitted); see Twombly, 550 U.S. at 554 ("[A]t the summary judgment stage a § 1 plaintiff's offer of conspiracy evidence must tend to rule out the possibility that the defendants were acting independently."). Rather, at this stage in the proceedings, plaintiffs "must only put forth sufficient factual matter to plausibly suggest an inference of conspiracy, even if the facts are susceptible to an equally likely interpretation." Gelboim v. Bank of Am. Corp., Nos. 13-3565-CV (L), et al., 2016 WL 2956968, at *16 (2d Cir. May 23, 2016). "The choice between two plausible inferences that

may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion." Gelboim, 2016 WL 2956968, at *15; see Twombly, 550 U.S. at 556 ("[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" (quoting Scheuer, 416 U.S. at 236)); Neitzke v. Williams, 490 U.S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance [] dismissals based on a judge's disbelief of a complaint's factual allegations.").

In contrast to defendants' characterizations, the complaint alleges that defendants acted to "ensure that the compounding pharmacy industry would not survive" and to "exclude Plaintiffs and other compounding pharmacies" so that "patients are purposefully being driven to inferior products" at defendants' and their co-conspirators own pharmacies. Compl. at ¶¶ 1, 6 & 11. Taken as a whole and read in the light most favorable to the plaintiffs, the factual allegations in the complaint are sufficient to support the inference that defendants and their co-conspirators had a preceding agreement to engage in concerted, unlawful action. The Court thus finds that the complaint states a plausible conspiracy claim under § 1 of the Sherman Act and the corresponding state antitrust statutes.

### B. State Law Claims

In addition to their federal and state antitrust claims, plaintiffs assert state statutory and common law claims, including a violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.* (Count V), unfair competition under Florida, Missouri, and Texas common law (Counts VI–VIII), and tortious interference with business relationships or expectancies under Florida, Texas, and Virginia common law (Counts IX–XII).

### 1.    Florida Deceptive and Unfair Trade Practices Act

The Florida Deceptive and Unfair Trade Practices Act (FDUTPA) establishes a civil cause of action for "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).  To state a claim under the FDUTPA, a plaintiff "must allege that a deceptive act or unfair practice caused actual damages." Fontana Inv'rs, LLC v. S. Beach Resort Dev., LLC, No. 13-cv-22780-UU, 2014 WL 803963, at *2 (S.D. Fla. Feb. 14, 2014) (citing Fla. Stat. § 501.204 and Florida state appellate court cases).

In support of their motion to dismiss, defendants argue that plaintiffs have not alleged a deceptive or unfair practice to support a FDUTPA claim.   Under FDUTPA, "[a]n unfair practice is one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." PNR, Inc. v. Beacon Prop. Mgmt., Inc., 842 So. 2d 773, 777 (Fla. 2003) (internal quotations omitted).  Deception occurs if there is a "representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." Id. (quoting Millenium Commc'ns & Fulfillment, Inc. v. Office of the Attorney Gen., 761 So. 2d 1256, 1263 (Fla. Dist. Ct. App. 2003)).  An alleged *per se* violation of FDUTPA may be based upon "[a]ny law, statute, rule, regulation or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices." Fla. Stat. § 501.203(3)(c); see Hap v. Toll Jupiter Ltd. P'ship, No. 07-81027-CIV, 2009 WL 187938, at *9 (S.D. Fla. Jan. 27, 2009).

Plaintiffs assert that they have alleged violations of law that Florida courts have found to serve as predicates for a FDUTPA claim, as well as additional facts that constitute unfair and deceptive acts. A violation of the FDUTPA may be based on "[a]ny rules promulgated pursuant to the Federal Trade Commission Act, 15 U.S.C. §§ 41, *et seq.*" Fla. Stat. § 501.203(3)(a). Furthermore, in drafting the FDUTPA, the Florida legislature intended to give "great weight" to the "interpretations of the Federal Trade Commission and the federal courts related to § 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1)." Fla. Stat. § 501.204. Unquestionably, unfair methods of competition unlawful under the FTC Act include practices that violate the Sherman Act and other antitrust laws. See, e.g., Ind. Fed'n of Dentists, 476 U.S. at 454. Because the complaint alleges sufficient facts to support plaintiffs' antitrust conspiracy claims, the violations of federal and state antitrust laws in turn constitute an unfair practice in support of plaintiffs' FDUTPA claim. Cf. JES Props. Inc. v. USA Equestrian, Inc., No. 802CV1585T24MAP, 2005 WL 1126665, at *19 (M.D. Fla. May 9, 2005) (finding that plaintiffs had failed to establish the elements of a FDUTPA claim when plaintiffs' FDUTPA claim was based on the same allegations as their antitrust claims and the court had found no violation of the federal antitrust laws); Clipper Marine, Ltd. v. Marlow-Hunter, LLC, 2014 WL 7178105, at *3 (M.D. Fla. Dec. 16, 2014) ("When considering whether a defendant's actions support a finding of unfair methods of competition, unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce, courts have regarded the concept as extremely broad." (internal quotations omitted)). Accordingly, the Court will deny defendants' motion to dismiss plaintiffs' FDUTPA claim in Count V.

## 2. Tortious Interference with Business Relationships or Expectancies

In Counts IX through XII, plaintiffs assert tortious interference with existing or prospective business relationships or expectancies under Florida, Texas, and Virginia common law. The complaint alleges that defendants tortiously interfered with plaintiffs' relationships with patients who either filled or likely would fill their prescriptions for compounded medicines at plaintiffs' pharmacies.

Under Florida law, the elements of tortious interference with a business relationship are: "(1) the existence of a business relationship, even if not evinced in a formal written agreement; (2) that the defendant knew of the relationship; (3) the defendant intentionally and unjustifiedly interfered with the relationship; and (4) damage to the plaintiff as a result of the breach of the relationship." Bray & Gillespie Mgmt. LLC v. Lexington Ins. Co., 527 F. Supp. 2d 1355, 1367 (M.D. Fla. 2007) (citing Ethan Allen, Inc. v. Georgetown Manor, Inc., 647 So. 2d 812, 814 (Fla. 1994)). "[N]o cause of action exists for tortious interference with a business's relationship to the community at large." Ethan Allen, 647 So. 2d at 815. Rather, "[a]s a general rule, an action for tortious interference with a business relationship requires a business relationship evidenced by an actual and identifiable understanding or agreement which in all probability would have been completed if the defendant had not interfered." Id.

In Texas, "[t]he elements of tortious interference with an existing business relationship 'are (1) the existence of a contract subject to interference, (2) the act of interference was willful and intentional, (3) such intentional act was a proximate cause of plaintiff's damages, and (4) actual damage or loss occurred." Whisenhunt v. Lippincott, 474 S.W.3d 30, 44 (Tex. Ct. App. 2015) (quoting Victoria Bank &

Trust Co. v. Brady, 811 S.W.2d 931, 939 (Tex. 1991)); accord Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc., 29 S.W.3d 74, 77 (Tex. 2000).  To prevail on a claim for "tortious interference with prospective business relations" in Texas, a plaintiff "must establish that (1) there was a reasonable probability that the plaintiff would have entered into a business relationship with a third party; (2) the defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; (3) the defendant's conduct was independently tortious or unlawful; (4) the interference proximately caused the plaintiff injury; and (5) the plaintiff suffered actual damage or loss as a result." Coinmach Corp. v. Aspenwood Apartment Corp., 417 S.W.3d 909, 923 (Tex. 2013).  Independently tortious means "conduct that would violate some other recognized tort duty." Wal-Mart Stores, Inc. v. Sturges, 52 S.W.3d 711, 713 (Tex. 2001).

"In Virginia, the elements of a claim for tortious interference with contractual relations are typically recited as (1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted." Schaecher v. Bouffault, 772 S.E.2d 589, 602 (Va. 2015).

In support of their motion to dismiss these claims, defendants first argue that plaintiffs have not identified any individual patients or any specific contract with which defendants have interfered.  Each of the tortious interference claims in the complaint requires the existence of a business relationship or expectancy.

These claims must assert more than relationships with the general public. They are not required, however, to be pled with heightened specificity or particularity. The complaint alleges that plaintiffs had ongoing and expected future business relationships with repeat customers who filled prescriptions for compounded medicines with plaintiffs. These customers included patients who submitted refillable prescriptions, through which they would receive multiple installments of prescribed medication over months or years. The complaint alleges that after defendants sent misleading letters to plaintiffs' customers and engaged in other tortious acts, repeat customers began receiving rejections for claims for coverage for compounded medication and stopped filling their prescriptions with plaintiffs. See, e.g., Compl. at ¶¶ 10, 103, 106. Plaintiffs claim that defendants redirected customers away from plaintiffs to pharmacies in which defendants have a financial interest. See Compl. at ¶¶ 1, 11–12, 159. The Court finds these allegations sufficient to set forth the existence of plaintiffs' business relationships or expectancies with which defendants allegedly tortiously interfered.

Also, to the extent that these claims pertain to plaintiffs' relationships with patients covered by pharmacy benefit plans managed by defendants, defendants argue that they cannot tortiously interfere with a contract to which it is a party or has a beneficial or economic interest. Plaintiffs' tortious interference claims concern their business relationships with patients who fill prescriptions for compounded medicines at plaintiffs' businesses. The complaint does not allege that defendants are parties to these contracts or relationships, nor do defendants describe their role as a pharmacy benefit manager as such. In contrast, plaintiffs allege that defendants are acting as competitors who have engaged in wrongful conduct to

redirect plaintiffs' business to pharmacies in which they have a financial interest. Based on the allegations in the complaint, defendants are not parties to the contracts or business relationships with which plaintiffs allege they tortiously interfered.

Lastly, defendants argue that allegations of conduct in which they were contractually or legally entitled to engage is insufficient to state a claim for tortious interference with existing or prospective business relationships. Defendants assert that they were justified in attempting to reduce the amount of money its third-party payor clients spend for compounded medicines and none of the conduct they allegedly took in pursuit of that goal was unlawful. Plaintiffs allege that defendants' wrongful actions, taken unilaterally and in concert with co-conspirators, included engaging in intentionally misleading communications to cause patients to question the safety of compounded medicines for the purpose of driving patients to mass produced drugs from which defendants could derive a profit. See Compl. at ¶¶ 10– 12, 159. The Court finds the allegations in the complaint sufficient to infer that defendants engaged in wrongful or unlawful conduct to support claims of tortious interference at this stage in the proceedings. Thus, plaintiffs have sufficiently stated tortious interference claims under Florida, Texas and Virginia law in Counts IX through XII.

### 3. Unfair Competition

Defendants further argue that plaintiffs have failed to adequately plead plausible unfair competition claims under Florida, Missouri and Texas common law, because they have not sufficiently alleged facts to support the assertion that defendants engaged in deceptive or unfair conduct. In opposition, plaintiffs

contend that they have sufficiently alleged that defendants engaged in deception and that the asserted common law unfair practices claims are not limited to deceptive acts.

"Under Florida common law, unfair competition is an 'umbrella for all statutory and nonstatutory causes of action arising out of business conduct which is contrary to honest practice in industrial or commercial matters.'" Tobinick v. Novella, No. 9:14-CV-80781, 2015 WL 6777458, at *5 (S.D. Fla. Oct. 2, 2015) (quoting Ameritox, Ltd. v. Millenium Labs., Inc., No. 8:11-CV-775-T-24-TBM, 2012 WL 33155, at *4 (M.D. Fla. Jan. 6, 2012)).  To state a claim for relief under Florida common law for unfair competition, "a party must show (1) deceptive or fraudulent conduct of a competitor and (2) likelihood of consumer confusion." Procaps S.A. v. Patheon Inc., 36 F. Supp. 3d 1306, 1332 (S.D. Fla. 2014) (emphasis omitted).  "[A] party may claim unfair competition under a variety of theories, including trademark infringement, and tortious interference with business relations." Ameritox, 2012 WL 33155, at *4 (internal quotations and citations omitted).  Accordingly, "courts have applied elements from other established claims to unfair competition claims, where appropriate, on a case-by-case basis." Id. (citing Mfg. Research Corp. v. Greenlee Tool Co., 693 F.2d 1037, 1040 (11th Cir. 1982), in which the court applied the elements of a claim for tortious interference to a claim for unfair competition based on tortious interference).

Under Missouri common law, "[d]eception is the true test of unfair competition." Am. Ass'n of Orthodontists v. Yellow Book USA, Inc., 277 S.W.3d 686, 693 (Mo. Ct. App. 2008); see Pan Am. Realty Corp. v. Forest Park Manor, Inc., 431 S.W.2d 144, 149 (Mo. 1968) ("[E]ither actual or probable deception must be

shown, the true test of unfair competition being whether the defendant's acts are such as are calculated to deceive the ordinary buyer making his purchases under the ordinary conditions which prevail in the particular trade to which the controversy relates."). "Whether or not a likelihood of confusion exists is a question of fact" under Missouri law. Cornucopia, Inc. v. Wagman, 710 S.W.2d 882, 888 (Mo. Ct. App. 1986).

Similarly, under Texas common law, the "law of unfair competition is the umbrella for all statutory and nonstatutory causes of action arising out of business conduct which is contrary to honest practice in industrial or commercial matters." Provident Precious Metals, LLC v. Nw. Territorial Mint, LLC, 117 F. Supp. 3d 879, 903 (N.D. Tex. 2015) (quoting Am. Heritage Life Ins. Co. v. Heritage Life Ins. Co., 494 F.2d 3, 14 (5th Cir. 1974)). A cause of action for unfair competition in Texas requires that a plaintiff allege "an illegal act by the defendant interfered with the plaintiff's ability to conduct its business," Taylor Publ'g Co. v. Jostens, Inc., 216 F.3d 465, 486 (5th Cir. 2000), and must be premised on some "independent substantive tort or other illegal conduct.'" Provident Precious Metals, 117 F. Supp. 3d at 903 (quoting RTLC AG Prods., Inc. v. Treatment Equip. Co., 195 S.W. 3d 824, 833 (Tex. Ct. App. 2006)); see Retractable Technlogies, Inc. v. Becton, Dickson, & Co., No. 2:08-CV-16-MHS-RSP, 2013 WL 5366104, at *3 (E.D. Tex. Mar. 14, 2013) (denying summary judgment on a Texas common law unfair competition claim because the established antitrust claims could serve as a basis thereof); Vendever LLC v. Intermatic Mfg. Ltd., No. 3:11-CV-201-B, 2011 WL 4346324, at *6 (N.D. Tex. Sept. 16, 2011) (finding that a sufficiently pled tortious interference with a reasonable business expectancy claim constituted illegal acts contrary to honest

business practices that interfered with plaintiff's business in support of stating a common law unfair competition claim).

As explained above, the complaint sufficiently pleads that defendants engaged in an antitrust conspiracy to boycott plaintiffs and that defendants tortiously interfered with plaintiffs' business relationships. Thus, plaintiffs' claims of antitrust violations and tortious interference, both of which allegedly interfered with plaintiffs' ability to conduct their businesses, provide the independent substantive torts or illegal conduct to support their common law claims of unfair competition. Therefore, plaintiffs have sufficiently stated unfair competition claims in Counts VI through VIII.

*    *    *    *    *

For the reasons set forth above,

**IT IS HEREBY ORDERED** that defendants' motion to dismiss plaintiffs' first amended complaint [Doc. #38] is **denied**.

**IT IS FURTHER ORDERED** that defendants' request for oral argument on their motion to dismiss [Doc. #57] is **denied**.


_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE


Dated this 24th day of August, 2016.