# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| PRECISION RX COMPOUNDING, LLC, and | ) | |
| C&M HEALTH PRO, LLC., | ) | |
| | ) | |
| Counter-Defendants, | ) | |
| | ) | Case No. 4:16-CV-0069 (CEJ) |
| vs. | ) | |
| | ) | |
| EXPRESS SCRIPTS. INC., | ) | |
| | ) | |
| | ) | |
| | ) | |
| Counter-Plaintiff | ) | |
| | ) | |

## MEMORANDUM OF LAW IN OPPOSITION TO EXPRESS SCRIPTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Counter-Defendants Precision Rx Compounding, LLC ("Precision") and C&M Health Pro, LLC, d/b/a All Scripts ("C&M") (collectively, "Counter-Defendants" or the "Pharmacies") submits this memorandum of law in support of its motion in opposition to Counter-Plaintiff Express Scripts, Inc.'s ("ESI") motion for partial summary judgment.

## INTRODUCTION AND STATEMENT OF FACTS

### *The Plan Sponsor - Pharmacy Benefit Manager – Pharmacy Relationship*

Pharmacy Benefit Managers ("PBMs") and health plan sponsors, such as insurers, HMOs and employers (collectively, the "Plans"), have a financial arrangement that is well-known and well-documented: PBMs, such as ESI, charge Plans one price for the cost of a drug for one of their enrollees while, on the other side of the transaction, reimburse the pharmacies that dispensed the drug at a lower rate, pocketing the difference, or the "spread," for themselves.  <u>Counter-Statement of Undisputed Facts</u> at ¶14-17.  To be clear, this means that PBMs, including ESI, ***do not*** bear the financial risk or burden of paying for a Plan-enrollee's medications out-of-pocket – all PBMs do, in

1

effect, is pay pharmacies using Plan-monies and keep the resulting spread for themselves.  Id.  As a logical consequence of the foregoing, if ESI does not return monies received from a Plan for a given claim, which ESI has deemed discrepant per an audit, any monies ESI may attempt to recoup from the pharmacy are the Plan's and not its own.  In essence, recoupment actions, assuming there has been no return of Plan monies, are profit-making enterprises for ESI.  *In other words, ESI's recoupment of funds under such circumstances does not put ESI back into the position it would have been in but for the alleged breach; rather, it puts ESI into a <u>better</u> position it would <u>not</u> have been in but for the alleged breach.*

ESI has omitted from its Motion for Summary Judgment any specific explanation or evidence of the foregoing relationships.  See, generally, Declaration of Sarah Hellmann, Esq. with Exhibits (making no mention of foregoing; Blaies Declaration with Exhibits (making no mention of foregoing). Thus, it has adduced no evidence on the question of whether ESI returned any Plan-monies to the relevant Plans for the claims for which they now seek damages.

### *ESI's Contracts with the Pharmacies and the Audits*

The Pharmacies each executed a Provider Agreement with ESI, which incorporates by reference ESI's Provider Manual (collectively, the "Contracts").  ESI Statement of Undisputed Facts at ¶1.  The Contracts do, as noted by ESI in its papers, indicate that the Pharmacies were subject to reversal and recoupment of claims by ESI should such claims be found to be discrepant, pursuant to the "Recoupment and Offset" and "Non-Compliance" clauses thereof.  Id. at ¶5.

Pursuant to ESI's papers and the Contracts, the alleged breaches of contract arose from ESI's determination that the following discrepant categories of claims were identified during certain 2015 and 2016 audits of the Pharmacies: (1) Other , (2) Unauthorized Mail, (3) No Signature Log/Missing Prescription/Not Picked Up/No Record of Fill, (4) Overbilled Quantity, (5) Compound

Documentation Required, (6) Non-FDA/OTC, (7) IRX-Invalid Prescription/Incomplete Script, (8) No Response to Audit, (9) Reversed Claim, (9) Use As Directed. <u>See, generally, Blaies Declaration</u>.

For many of these discrepancy types, it is entirely unclear what the discrepancy type means and none of the documents submitted by ESI in support of its Motion for Partial Summary Judgment clarify that meaning. <u>Counter-Statement</u> at ¶2, 8, 13. For example, "OTH" is defined to mean "Miscellaneous Discrepancy – Prescription was submitted with a discrepancy not otherwise noted." <u>Id.</u> at ¶13. By omitting the specific basis for ESI's identification of a claim as discrepant, ESI fails to properly notify the pharmacy of a discrepancy subject to recoupment, thus seriously calling into question the legitimacy of ESI's alleged discrepancy findings.

The Pharmacies do not contest that, assuming <u>arguendo</u>, ESI had correctly identified the foregoing classes of discrepant claims, ESI would have been within its rights to terminate the Pharmacies from ESI's pharmacy network.  The Pharmacies ***do contest***, however, that these same classes of discrepant claims resulted – or even could have theoretically resulted – in financial detriment to ESI. <u>Id.</u> at ¶4, 9, 14-17.

### *As to the Breach of Contract Counts*

ESI has failed to adduce any evidence necessary for determining whether it suffered any actual, compensable harm in support of its breach of contract claims, namely, evidence demonstrating it has returned all or even some of the monies it received from the Plans relevant to the allegedly discrepant claims identified in ESI's audits of the Pharmacies ("Audits"). <u>See, generally, Declaration of Sarah Hellmann, Esq.</u> with <u>Exhibits</u> (making no mention of foregoing; <u>Blaies Declaration</u> with <u>Exhibits</u> (making no mention of foregoing). ESI's lack of candor on this point is troubling, as granting summary judgment under ESI's theory of the case would not put ESI back in the position it would have been in had the alleged breach not occurred but, instead, would result in an unmerited windfall or, in some sense, a judicially-secured profit.  And, if the Pharmacies are wrong on this point, and ESI has returned

every cent it received from the Plans for the prescriptions dispensed, the onus is on ESI – not the Pharmacies – to demonstrate the same.

Moreover, irrespective of the foregoing, nearly all of its claims – totaling (per ESI's calculations, which we assume, <u>arguendo</u>, are accurate) **at least** $653,530.53, or 53% of the total value of the claims – are for breaches that did not result in any actual harm to ESI, as the prescriptions for which ESI paid the Pharmacies were dispensed and, therefore, ESI received the benefit of the bargain under the Contracts. <u>Counter-Statement</u> at ¶4.  For example, even assuming, <u>arguendo</u>, that the Pharmacies had, in fact, shipped medications into States in which the Pharmacies were not licensed, ESI has adduced precisely zero evidence that the patients did not receive the medications shipped or that the patients returned the medications and demanded a refund. <u>See</u>, <u>generally</u>, <u>Declaration of Sarah Hellmann, Esq.</u> with <u>Exhibits</u> (making no mention of foregoing; <u>Blaies Declaration</u> with <u>Exhibits</u> (making no mention of foregoing). While ESI could certainly argue that, under the Contracts, such alleged breaches could serve as grounds to terminate network participation – it could not with any seriousness argue that they resulted in financial harm to the company, <u>i.e.</u>, that compensatory damages are required to put ESI back into the same position it would have been in had the alleged breaches not occurred.  Asserting otherwise, as ESI does, is disingenuous at best.

Further, ESI fails to identify the States into which the medications were allegedly improperly shipped – and this failure is not an insignificant one.  Certain States, including New York and Massachusetts, among others, have (or had during the relevant time period) express statutory exemptions, such as the *de minimis* exemption, that would allow for the shipping of certain quantities of certain types of medications without a license.  <u>See previous cite comparison</u>.

Additionally, there are a small percentage of what can only be characterized as "other" discrepancy types, which are so nebulously and ambiguously labeled/identified by ESI in its Motion as to be incomprehensible.  Specifically, there are at least 35 claims identified in the audits as "OTH"

or "Miscellaneous Discrepancy[,]" the definitions of which are given no meaningful clarification whatsoever in the Contracts. Counter-Statement at 2, 13. It is no wonder, then, that, within its brief, ESI makes no attempt to explain the nature or specifics of these alleged breaches. Like the pleading of damages, to succeed on a breach of contract claim, a movant must, with some reasonable degree of specificity, identify the nature of the breach. ESI, in connection with these "other" discrepancy types, has utterly failed to do so, and cannot, therefore, succeed as a matter of law. To the extent ESI contends that the "other" discrepancy types have been adequately identified for purposes of pleading a breach of contract claim, it must convince the court why the evidence it has adduced has sufficiently done so. Thus, at best, there is a genuine dispute as to material fact as to whether these "OTH" and "Miscellaneous" discrepancy types, and the breaches they allegedly represent, have been sufficiently identified for purposes of prevailing on a breach of contract claim.

## LEGAL ARGUMENT

### I.    LEGAL STANDARD ON MOTION FOR SUMMARY JUDGMENT

Summary judgment is only appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "[T]he moving party 'has the burden of ***clearly establishing the non-existence of any genuine issue of fact that is material to a judgment in his favor.***'" City of Mt. Pleasant, Iowa v. Associated Elec. Co-op, Inc., 838 F.2d 268 (8th Cir. 1988) (emphasis supplied) (quoting Cedillo v. International Assoc. of Bridge Workers, 603 F.2d 7, 10 (7th Cir. 1979)). Thus, should "plaintiff . . . fail[] to adduce facts sufficient to establish the existence of an element essential to plaintiff's case[,]" summary judgment must be denied. Cheatham's Furniture Co. v. La-Z-Boy Chair Co., 728 F.Supp. 569, 572 (E.D.MO 1989) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)).

In ruling on a motion for summary judgment, the Court is required to view the facts in a light most favorable to the non-moving party and must give that party the benefit of all reasonable inferences to be drawn from the underlying facts.  Buller v. Buechler, 706 F.2d 844, 846 (8th Cir. 1983).  Moreover, the Court is required to resolve all conflicts in favor of the non-moving party. Robert Johnson Grain Co. v. Chemical Interchange Co., 541 F.2d 207, 210 (8th Cir. 1976).  The Court may not consider the credibility of the witnesses or the weight of the evidence.  White v. Pence, 961 F.2d 776, 779 (8th Cir. 1992).  The moving party bears the burden of showing both the absence of a genuine issue of material fact and its entitlement to judgment as a matter of law.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

**II.**      **There Is a Genuine Dispute of Material Fact On the Question of Whether ESI Returned Some Or All of the Plan-Monies Used to Pay for the Claims At Issue, As This Is The Only Way In Which ESI Could Possibly Have Been Damaged, Assuming The Truth of The Allegations.**

        **a.**      **Every Claim Paid by ESI to the Pharmacies (Or Any Pharmacy) Was Reimbursed by the Plan-Enrollee's Plan and ESI Has Adduced No Evidence That These Plan-Monies Were Ever Returned.**

In In re Express Scripts, Inc., PBM Litigation, 2008 WL 2952787 (E.D.Mo. 2008), this Court succinctly laid out the various means through which "PBMs [including ESI] operate to generate profits, which [profits] they derive from several sources." Id. at *3.[1]  This Court went on to note that "[w]hile the interplay among, and gains from, these sources are not defined to them in exact terms, plan sponsors are aware of, and assent to, the PBMs' general compensation scheme.  Specifically, sponsors glean such information from the PBMs competing for the plan's business, industry consultants, and the very terms of the parties' agreements." Id.  Among such sources of PBM income generally known to plan sponsors, is the "spread pricing" arrangement, wherein PBMs, such as ESI, charge the Plans one price at X-dollars for a given drug, and then using "access to the PBMs' vast

---

[1] See Counter-Statement at ¶15, FN1 for discussion concerning/request for judicial notice.

clientele" as inducement, pay to retail or mail order pharmacies a substantially discounted amount (i.e.,

less than the X-dollars) for the same drug.  Id. at *5.  This Court articulated this relationship as follows:

"Specifically, in order to gain access to the PBMs' vast clientele, retail pharmacies offer PBMs reduced

prices and dispensing fees.  PBMs often realize a margin ('spread') between the amounts billed to plans

pursuant to the respective PBM contracts, and the amounts paid to pharmacies."  Id.; see also

Pharmacy Benefit Managers: Ownership of Mail-Order Pharmacies, 2005 WL 2234759, at *25 (F.T.C.)

(a Federal Trade Commission (FTC) "Guide/Report" wherein the FTC states: "PBMs earn revenues

and profits through the 'spread' between the amount charged to a plan sponsor and the amount paid

for the drug product, including a dispensing fee if any, to the retail or mail-order pharmacy that

dispenses the drug product to the plan member.");[23] Ohio's Medical Managed Care Pharmacy Services

Auditor of State Report (8/16/18) (PBMs "generate revenue through . . . the margin between the

amount charged to insurance plan sponsors and the amount paid out to pharmacies for a prescription

(also            referred            to            as            'spread            pricing'")).

https://audits.ohioauditor.gov/Reports/AuditReports/2018/Medicaid_Pharmacy_Services_2018_F

ranklin.pdf (last accessed 10/12/18).[4]

        And, indeed, ESI makes no secret of this arrangement, noting in its "Defendants' Response

to First Amended Class Action Complaint" in the In re Express Scripts matter, that:

> ESI also assists third-party payers and health plan administrators by adjudicating
> claims for prescription drug benefits submitted by pharmacies, thereby acting as
> intermediaries between the third-party payers and pharmacies in providing pharmacy
> benefits.  To fulfill its role, ESI created pharmacy networks by negotiating with retail

---

[2] See Counter-Statement at ¶15, FN2 for discussion concerning /request for judicial notice.
[3] The Pharmacies note that the "spread" is only but one revenue stream flowing from this
relationship.  PBMs also receive substantial revenues, for example, through "rebates" from drug
manufacturers, which rebates are "directly attributable to the plan's use of 'preferred formulary
pharmaceuticals . . . rebates are owed, and directly paid, to the PBMs."  In re Express Scripts, Inc.,
PBM Litigation, 2008 WL 2952787, supra, at *5.
[4] See Counter-Statement at ¶15, FN4 for discussion concerning/request for judicial notice.

pharmacies that agree to accept defined reimbursement rates when they fill prescriptions for health plan members.[5]

[Defendants' Response to First Amended Class Action Complaint, 2008 WL 2127151 (E.D.Mo. 2008) at ¶21.]

Later, in addressing a Plan's allegation that ESI had harmed it, ESI raised as one of its Affirmative Defenses that: "Plaintiff's claims are barred because the [Plan] has received a net benefit from the acts of ESI in that the [Plan] lowered its costs and it received other benefits due to the action of ESI and those benefits exceed the compensation paid to ESI."  Id. at Affirmative Defense ¶ 13.

The above is entirely consistent with the statements made by ESI in its Answer to Second Amended Complaint and Counterclaim.  See id. at ¶12 ("As a pharmacy benefit managers ('PBM'), Express Scripts contracts with third party payor and health plan administrators – such as insurers, HMOs, and employers – to facilitate delivery of prescription drugs to health plan members or other beneficiaries."), ¶22 (". . . Plaintiffs received payment from Express Scripts for patients' prescriptions medications by virtue of Express Scripts' business relationships with those patients and health plan sponsors."), ¶24 ("Express Scripts had an economic and financial interest in payments made to Plaintiffs for prescription medications that Plaintiffs dispensed to Express Scripts members, both in its own right and by virtue of Express Scripts' business relationship with those patients' health plan sponsors"), at ¶12.  It is also consistent with the Declarations and Exhibits submitted in support of its Motion for Partial Summary Judgment.  See Declaration of Greg Blaies at ¶ ("Express scripts provides value to its client health plans by reducing waste and inefficiency . . . As a PBNM . . . [ESI] contracts with third-party payors and health plan administrators . . . to facilitate delivery of prescription drugs to health plan members or other beneficiaries), at ¶7 ("To fulfill its role, [ESI] creates pharmacy provider networks by negotiating with pharmacies that agree to fill prescriptions for health plan members."); Exhibit. 2 to Declaration of Greg Blaies at pp. 1 (wherein the RECITALS set forth in

_____

[5] See Counter-Statement at ¶15, FN5 for discussion concerning/request for judicial notice.

8

detail ESI's payment of discounted drug prices to pharmacies to provide lower drug prices for Plan-enrollees).

In sum, the fact that ESI is reimbursed by Plans for every script paid for by ESI to a pharmacy (at a discounted rate) is not and cannot plausibly be in dispute. Moreover, a review of the evidence adduced by ESI in support of its Motion for Partial Summary Judgment contains no documents, discussions or testimony demonstrating (or even alluding to) that ESI paid the Plans back for the claims at issue in the Counterclaims. See, generally, Declaration of Sarah Hellmann, Esq. with Exhibits (making no mention of foregoing; Blaies Declaration with Exhibits (making no mention of foregoing).

   b. **There Can Be No Breach of Contract Because ESI Failed to Adduce Any Evidence of Damages**

Because ESI has adduced zero evidence demonstrating or even tending to demonstrate that it returned the Plan-monies it received for the claims at issue in the Counterclaims, it cannot, as a matter of law, show that is suffered any damages from the alleged breaches of contract by the Pharmacies.

To prevail on a breach of contract claim, the complaining party must "establish the existence of a valid contract; the rights of plaintiff and obligations of defendant under the contract; a breach by defendant; and damages resulting from the breach." Clayborne v. Enterprise Leasing Company of St. Louis, LLC, 524 S.W.3d 101, 106 (Mo. App. E.D. 2017) (citing Lucero v. Curators of Univ. of Mo., 400 S.W.3d 1, 5 (Mo. App. W.D. 2013)). On a motion for summary judgment, plaintiff is required to show that there is no "genuine dispute as to the material facts establishing: (1) existence of a valid contract; (2) [defendant's] obligation under the contract; (3) a breach by [defendant] of that obligation; and (4) resulting damages." Id. (citing C-H Building Associates, LLC v. Duffey, 309 S.W.3d 897, 899 (Mo. App. W.D. 2010)).

"The objective of awarding damages is to make the injured party whole by placing it in the position it would have been in if the contract had been performed." Asamoah-Boadu v. State, 328 S.W.3d 790, 796 (Mo. App. W.D. 2010) (citing U.S. Neurosurgical, Inc. v. Midwest Div-RMC, LLC,

303 S.W.3d 660, 667 (Mo. App. W.D. 2010)).  A corollary to this principle is that "[d]amages for breach of contract are limited to the loss of the benefit itself[.]" Overcast v. Billings Mut. Ins. Co., 11 S.W.3d 62, 67 (Mo. 2000).  Therefore, "[t]he law . . . *cannot elevate the injured party to a better position than it would have been in had the contract been performed* . . ." Asamoah-Boadu, 328 S.W.3d, at 796 (emphasis added); see also Russel v. Farmers & Merchants Ins. Co., 834 S.W.2d 209, 220 (a party "*may not recover from all sources an amount in excess of the damages sustained, or be put in a better condition than he would have been had the wrong not been committed*.") (emphasis supplied) (quoting Weeks-Maxwell Const. Co. v. Belger Cartage Services, Inc., 309 S.W.2d 792, 796 (Mo. KC App. 1966)).

Here, even assuming, arguendo, the truth of *all* of ESI's statements of fact, ESI cannot prevail under a breach of contract theory, as it has adduced precisely *zero* evidence that it repaid the Plan-monies to the relevant Plans, which monies were received by ESI and used to pay the Pharmacies. Consequently, ESI has totally failed to demonstrate it has suffered damages.  Moreover, should this Court grant ESI's Motion for Summary Judgment, it will necessarily place ESI in a better condition than it would have been in, had the Pharmacies performed as they should have (though allegedly did not).  This would be a tremendous, and unearned windfall for the PBM.  Had the Pharmacies never (as they are alleged to have done) breached, ESI would have received the Plan-monies, pocketed the spread, and paid the remainder to the Pharmacies.  It would *never* have received an additional million dollars (plus) from the Pharmacies, as it will if its Motion is granted.

For the foregoing reasons, ESI has failed to demonstrate it suffered damages and, as a consequence, failed to satisfy a necessary element of their breach of contract Counts.  These Counts should therefore be denied in full.  If ESI did, in fact, return the Plan-monies to the Plans, it bears the burden of presenting evidence of the same – unless and until it does so, the issue of whether it suffered

damages as a result of the alleged breaches of contract is in genuine dispute, as is the amount of damages (if any) allegedly suffered therefrom.

    **c.** **In Failing to Adduce Evidence That It Returned Monies to the Relevant Plans, ESI Has Converted the Recoupment and Offset Clauses of the Contracts into Invalid and Unenforceable Penalty Provisions**

If ESI did not return the Plan-monies to the relevant Plans, then the "Non-Compliance" and "Recoupment and Offset" provisions within the Contracts have become invalid and unenforceable "penalty clauses" under Missouri law.  In determining whether a contract provision is a "penalty clause," Missouri courts employ the following test: "[a]n agreement, made in advance of breach, fixing the damages theefor, is ***not enforceable*** as a contract and does not affect the damages recoverable for the breach unless (a) the amount so fixed is a reasonable forecast of just compensation for the harm that is caused by the breach, ***and*** (b) the harm that is caused by the breach is one that is incapable or very difficult of accurate estimation."  Arcese v. Daniel Schmitt & Company, 504 S.W.3d 772, 778 (Mo. App. E.D. 2016) (emphasis supplied) (quoting Restatement of Contracts § 339)).

Here, if ESI has simply been spending Plan-monies to cover the cost of the Plan-enrollees' medications – and has not returned to the Plans the monies for the claims for which it now seeks recoupment – the "Non-Compliance" and "Recoupment and Offset" clauses can only be characterized as agreements, made in advance of a breach, which fixed the rate of damages to be imposed therefor – at up to 100-cents on the dollar for each discrepant claim per the clauses – and which fixed an unreasonable forecast of just compensation for the harm that is caused by the breach. Indeed, the "forecast of just compensation" in such a case would be ***necessarily unreasonable***, as ESI could not have and would not have suffered any compensable, actual harm, ***since it was spending other entities' monies***.

The foregoing, too, makes the question of whether ESI returned Plan-monies a genuine dispute of fact, since, if ESI did not do so, the contractual provisions under which it is suing are invalid and unenforceable penalty clauses.

**III.   ESI Cannot Show Actual Damages In 92% of the Claims Because It Failed to Adduce Any Evidence That Services Were Not Rendered By the Pharmacies In Connection Therewith, Including the Dispensing and Delivery of the Medications at Issue.**

From a monetary perspective, 92% of the classes of discrepant claims identified by ESI in the Audits are: (1) "UM" - shipping into States in which the Pharmacies were not licensed ('Unlicensed Shipping Claims"), (2) "Miscellaneous Discrepancy," (3) "OTH – Other," (4) No Signature Log/Missing Prescription/Not Picked Up/No Record of Fill, (5) Compound Documentation Required, and (6) Use As Directed ("Primary Claims"), representing $1,141,295.19 in alleged damages. While ESI could plausibly argue that the alleged classes of discrepant claims identified may be sufficient grounds under the Contracts for termination (assuming, <u>arguendo</u>, they were in fact discrepant), ESI cannot plausibly argue that it suffered any actual damages as a result of the Primary Claims because ESI adduced no evidence indicating that services were not fully rendered in connection with the same.  On a motion for summary judgment, *the onus is on plaintiff to make a showing that there is no genuine dispute as to the material facts establishing each and every element of a claim – thus, in this case, ESI was obligated to adduce evidence supporting the existence of, among other elements of a breach of contract claim, actual damages*.  <u>C-H Building Associates, LLC</u>, 309 <u>S.W.3d</u>, at 899, <u>supra</u>. (discussing burden on movant on a motion for summary judgment).

Here, nowhere within ESI's moving papers is there even an intimation that the Pharmacies failed to dispense the medications for the Primary Claims, that the patients failed to receive those medications, or that the patients contacted ESI or their Plans to complain of any deficiencies concerning the Pharmacies' service.  For the foregoing reasons, ESI cannot prevail on its Motion for

Partial Summary Judgment with regard to the Primary Claims.  Minimally, there arises from the foregoing a genuine dispute of material fact as to whether ESI suffered actual harm as a result of the alleged breaches arising out of the Primary Claims.

### IV.   ESI Failed to Specify Which States The "Unlicensed Shipping Claims" Were Shipped Into and, As Such, It Has Failed to Adduce Evidence Demonstrating The Shipping Was, In Fact, Unlicensed.

The Unlicensed Shipping Claims – which make up the bulk of the claims underpinning the Counterclaim – are predicated on the assumption that all of the States into which those claims were shipped required licensure for shipping.  This assumption is incorrect.

It was not until December 17, 2015 in Pennsylvania, for example, that a nonresident pharmacy was required to register with the Pennsylvania Board of Pharmacy prior to being permitted to ship into that State.  See 63 P.S. § 390-4.1.  There are a considerable number of claims underpinning the Counterclaims that pre-date December 17, 2015.  ESI's failure to clarify what States the Unlicensed Shipping Claims were shipped to, therefore, precludes this Court's ability to determine whether any unlicensed shipping actually occurred.  The same is true for Massachusetts, with its nonresident pharmacy registration regulation only becoming effective as of December 31, 2014.  See M.G.L.A. 112 § 39J.  And New York State has an express de minimis or "isolated transactions" exception, which allows nonresident pharmacies to ship "600 or fewer prescriptions per calendar years for drugs" without a nonresident pharmacy license.  See 8 NYCCR 63.8.

As ESI has utterly failed to adduce evidence specifying into which States the Unlicensed Shipping Claims were shipped, there is no way for this Court to determine whether these claims involved shipping that was, in fact, unlicensed.  For these reasons, summary judgment should not be granted with regard to the Unlicensed Shipping Claims.  Minimally, there is a genuine dispute of fact as to whether the Pharmacies were or needed to be licensed to ship the Unlicensed Shipping Claims into the States at issue, as ESI has failed to adduce any evidence that would clarify the same.

**V.      ESI Failed to Articulate Any Cognizable Breach With Regard to 43% of the Claims and, As Such, Cannot Succeed On a Theory of Breach of Contract In Relation to The Same.**

From a monetary perspective, 43% of the classes of discrepant claims identified by ESI in the Audits are labeled simply: (1) "OTH" and (2) "Miscellaneous Discrepancy" ("Minority Claims"), constituting $532,120.88 in alleged damages.  These terms are not self-defining and are, inarguably, unintelligible in the absence of further definition.  Nowhere within the Declarations and Exhibits produced by ESI in support of its Motion, however, are these classes of discrepant claims defined.  In the absence of further clarification or guidance by ESI, such terms may (generously) be characterized as ambiguous.  See Ridley v. Newsome, 754 S.W.2d 912, 914-15 (Mo. App. W.D. 1988).  Moreover, the unintelligibility of those terms – within the context of the evidence adduced by ESI – render it impossible for the Pharmacies to discern or identify what the nature of the alleged breaches are.

As establishing a "breach" is a necessary element to prevail under a breach of contract claim – and one which must be supported by undisputed factual evidence by movant on a motion for summary judgment – ESI cannot prevail with regard to the Minority Claims in light of the foregoing. See Clayborne, 524 S.W.3d, supra, at 106.

**VI.      C&M Respectfully Requests That It Be Afforded An Opportunity to Respond to ESI's Requests for Admissions and That, Until Such Time, The Requests for Admissions Relied Upon by ESI Should Be Deemed Withdrawn.**

The transfer of the quite sizeable case file from previous counsel to current counsel, coupled with the multiple modifications and clarifications to the various Case Management Orders in this matter, resulted in a certain level of chaos and confusion. Levitt Declaration at ¶7.  C&M respectfully requests that it be afforded an opportunity to respond to the Requests for Admissions out of time, see F.R.C.P. 36(b) (permitting withdrawal or amendment of Requests for Admissions), and that, pending ESI's receipt of the same, the Requests for Admissions relied upon by ESI in its Motion for Partial Summary Judgment be deemed withdrawn.

To this end, we note that this Circuit has "generously" interpreted F.R.C.P. 36(b)'s language, which allows for the withdrawal or amendment of Requests for Admissions "on motion" – construing "court filings that were not formal motions" as constituting Motions to Withdraw under that Rule nonetheless.  See Quasius v. Schwan Food Co., 596 F.3d 947, 951 (8th Cir. 2010).  Reviewing the Eighth Circuit's precedent on this issue, the Court in Quasius noted that those "decisions are best understood as exercising authority to permit withdrawal or amendment of admissions under Rule 36(b), because the party who admitted matters later filed with the court a pleading that was sufficient to constitute a 'motion' under a liberal reading of the rule."  Id. at 952.

We respectfully request that this portion of the Pharmacies' Motion in Opposition to ESI's Partial Motion for Summary Judgment be deemed a "motion to withdraw or amend," consistent with the Eighth Circuit's generous and liberal construction of Rule 36(b).

## **CONCLUSION**

For the foregoing reasons, Counter-Defendants respectfully request that (1) Counter-Plaintiff's Motion for Partial Summary Judgment be denied in full, and that (2) C&M's responses to ESI's Requests for Admissions be deemed withdrawn pursuant to F.R.C.P. 36(b), affording C&M the opportunity to file responses to those Requests for Admissions out of time.


Respectfully submitted,

By:  /s/Jonathan E. Levitt
     Jonathan E. Levitt, Esq. # 65680
     Frier & Levitt, LLC
     84 Bloomfield Avenue
     Pine Brook, NJ 07058
     Phone:  (973) 618-1660
     Fax:  (973) 618-0650
     JLevitt@frierlevitt.com


Dated:  October 12, 2018

**CERTIFICATE OF SERVICE**

I hereby certify that on October 12, 2018, the foregoing document was electronically filed. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt and service will effectuated in the same manner.

Respectfully submitted

By:  /s/Jonathan E. Levitt
      Jonathan E. Levitt, Esq. # 65680
      Frier & Levitt, LLC
      84 Bloomfield Avenue
      Pine Brook, NJ 07058
      Phone:  (973) 618-1660
      Fax:  (973) 618-0650
      JLevitt@frierlevitt.com

Dated: October 12, 2018